WP

Walker G. Harman, Jr. [WH-8044]
1350 Broadway, Suite 1510
New York, New York 10018
212-425-2600
Attorney for Plaintiff

**07 CV 7058**

**JUDGE** ~~SWAIN~~ **KARAS**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

**DOC # _____**

JANE A. WILSON,

                              Plaintiff,

            -against-

MARYKNOLL FATHERS & BROTHERS; FR. JOHN
BARTH; FR. RICHARD FRIES; ADRIANE GLASS;
FR. JOHN McAULEY; FR. FRANCIS McGOURN;
FR. LEO SHEA; and FR. JOHN SIVALON,

                              Defendants.
------------------------------------------------------------------X

Civil Action No:

**COMPLAINT**

**PLAINTIFF HEREBY
DEMANDS A TRIAL
BY JURY**

FILED 2007 AUG -8 AM 10:55 U.S. DISTRICT COURT S.D. OF N.Y.

        Plaintiff, Jane Wilson, by her attorney, Walker G. Harman, Jr., as and for her complaint

against Defendants, Maryknoll Fathers & Brothers, Fr. John Barth, Fr. Richard Fries, Adriane

Glass, Fr. John McAuley, Fr. Francis McGourn, Fr. Leo Shea, and Fr. John Sivalon alleges as

follows:

### PARTIES, JURISDICTION AND NATURE OF ACTION

        1.        Plaintiff, Jane Wilson, a citizen of the State of New York, was subject to ongoing

gender and sexual orientation discrimination and was illegally terminated in retaliation for

regularly raising her rights under anti-discrimination laws.

        2.        Defendant, Maryknoll Fathers & Brothers ("Maryknoll") is a corporation

authorized to do business in New York, located at 55 Ryder Road, Ossining, NY 10562.

3.      Defendant, Fr. John Barth, is an employee of Maryknoll, working as Assistant General.

4.      Defendant, Fr. Richard Fries, is an employee of Maryknoll, working as the Director of the Mission Education and Promotion Department.

5.      Defendant, Adriane Glass, is an employee of Maryknoll, working as the Director of Human Resources.

6.      Defendant, Fr. John McAuley, is an employee of Maryknoll, working as Assistant General.

7.      Defendant, Fr. Francis McGourn, is an employee of Maryknoll, working as Vicar General.

8.      Defendant, Fr. Leo Shea, is an employee of Maryknoll, working as the Society Coordinator for the Capital Campaign, and former Director of Mission Education and Promotion.

9.      Defendant, Fr. John Sivalon, is an employee of Maryknoll, working as the Superior General.

10.     Ms. Wilson was unlawfully terminated on June 29, 2006 in violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII").

11.     During the tenure of Ms. Wilson's employment, she worked in a hostile work environment where she was mocked by and ridiculed by her superiors in front of other staff members solely because of her gender and sexual orientation.

12.     In response, after six months of employment, Ms. Wilson took her complaints to Adriane Glass, the Director of Human Resources. No formal investigation was ever made. Ms. Wilson continued to complain.

13.     After a long period of dedicated service and positive feedback for her work-related duties, Ms. Wilson was illegally terminated on June 29, 2006 in retaliation for regularly raising her rights under anti-discrimination laws.

14.     This action seeks compensatory and punitive damages for Defendant's violations of Title VII of the Civil Rights Act, New York City Administrative Code § 8-502(a), *et. seq.,* New York Executive Law § 296, *et. seq.*, and the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1166.

15.     Mr. Wilson filed a charge with the Equal Employment Opportunity Commission ("EEOC") and was issued a right to sue letter on June 8, 2006.

16.     Venue is properly laid in this Court in that the unlawful conduct giving rise to this Complaint occurred within the Southern District of New York.

## BACKGROUND

### I.

17.     Ms. Wilson began work with Maryknoll in October 2002.

18.     Ms. Wilson was given the title Director of Development with a starting salary of $88,000.  In January, she was promoted to the Executive Director of Marketing and Development, with a salary increase to $110,000.  Upon information and belief, Fr. Shea was publicly opposed to this promotion solely because of Ms. Wilson's gender and sexual orientation.

19.     Ms. Wilson was highly qualified for her position with Maryknoll, as she had nearly twenty (20) years of experience in fundraising.

20.    Ms. Wilson was an excellent employee who never received negative feedback and who helped Maryknoll raise over $140,000,000 during her time there. Ms. Wilson even received positive performance appraisals for three (3) years from Fr. Fries, where she received the highest possible rating with no negative feedback, although she was subject to ongoing discrimination.

21.    From the very beginning of her employment with Maryknoll, Ms. Wilson experienced constant discrimination because of her gender and sexual orientation.

22.    Two of Ms. Wilson's supervisors, namely, Fr. Shea and Fr. Fries, were the primary source of harassment and ridicule.

23.    Fr. Shea refused to look Ms. Wilson in the eye and communicate with her directly. He would not respond to her e-mails. He would even single out and ridicule Ms. Wilson in front of other staff members.

24.    Ms. Wilson's work performance was beyond reproach as evidenced by a salary increase, additional job responsibilities, positive work evaluations, and by her consistently meeting her agreed upon targets and performing extremely well for the organization, even under very difficult circumstances.

25.    Due to the fact that Ms. Wilson was an excellent performer at Maryknoll, the only reason for the harassment could be Ms. Wilson's gender and sexual orientation.

26.    In fact, Ms. Wilson was specifically told by a fellow employee, Theresa McGee, that Fr. Shea did not like her because of her sexual orientation.

27.    Ms. Wilson received similar treatment from Fr. Fries, who would send her inappropriate e-mails about non-work related matters.

28.    The Defendant was at all times aware of Ms. Wilson's civil rights yet deliberately disregarded them.

29.    Upon information and belief, Defendant knew of the ongoing discrimination against Ms. Wilson.  Nevertheless, the Defendant refused to take any meaningful action.

30.    Ms. Wilson was ultimately terminated in violation of anti-discrimination laws.

31.    Upon information and belief, Defendant's actions were done maliciously and/or in reckless disregard for Ms. Wilson's civil rights.

## DISCRIMINATION

### II.

32.    Ms. Wilson was degraded and humiliated in the work place because of derogatory and offensive comments made regarding her gender and sexual orientation.

33.    During Ms. Wilson's interview with the hiring committee, one participant, Fr. Leo Shea, walked out of the interview without any explanation.  Ms. Wilson later was told by Fr. McAuley, Assistant General, that Fr. Shea did this because he did not like her due to the fact that she was female and gay.

34.    Teresa McGee, the Director of Society Member Services, stated to Ms. Wilson that the leadership felt uncomfortable with Ms. Wilson because she was a woman and she was gay.

35.    From the beginning, as her supervisor, Fr. Shea refused to look her in the eye.  He refused to communicate with her directly, and would not respond to her e-mails.  Furthermore, Fr. Shea would single out and ridicule Ms. Wilson in front of subordinates and other staff members.  He was disruptive and condescending during Ms. Wilson's staff meetings.

36.    On at least one occasion, Fr. Shea mocked Ms. Wilson in front of the entire room for purportedly mispronouncing a word.

37.    On another occasion, at a National Mission Promotion Meeting with over thirty (30) people in attendance, Fr. Shea publicly demeaned her as a woman for not knowing the name of a sports team. Fr. Shea then obnoxiously spewed that, "if she does not know the difference between sports teams, I wonder what else she does not know?"

38.    In December 2004, Fr. Shea was demoted, and Fr. Fries became Ms. Wilson's direct supervisor. Ms. Wilson received similar treatment from Fr. Fries. For example, Fr. Fries called Ms. Wilson his "right hand guy." He also sent her inappropriate e-mails that had no relevance to her job duties or performance. These e-mails included information on subjects like PMS and other issues related to women, but completely unrelated to work duties or performance. One e-mail described how a dumb blonde woman cannot operate a mechanical horse. Another e-mail from Fr. Fries only to Ms. Wilson described a fabricated study that "revealed that the kind of face a woman finds attractive on a man can differ depending on where she is in her menstrual cycle."

39.    In addition, Ms. Wilson was told to participate in Life Coaching given by Adriane Glass "so that she could feel comfortable in her own skin." Upon information and belief, Ms. Glass has not had proper training and is not otherwise qualified to perform so-called "Life Coaching." Ms. Glass specifically stated that the "Life Coaching" was not performance related, meaning that it had nothing to do with the quality of her work. Ms. Wilson took this to mean that the purpose of the coaching was to address her sexual orientation.

40.    The Monday prior to her termination, Ms. Wilson was instructed to meet with Theresa McGee, who told her that an incident and complaint had been brought by one employee against another employee in the same department where Ms. Wilson was assigned. Ms. McGee specifically stated that Ms. Wilson was not implicated in the complaint, and that the sole purpose

of the meeting was to question Ms. Wilson as to whether any additional employees needed to be interviewed.

41.    Ms. Wilson believed that Defendants used this purported work incident to justify her pre-textual termination.

## RETALIATION

### III.

42.    Ms. Wilson complained to Adriane Glass, the Director of Human Resources, about Fr. Shea at least six (6) times, twice in writing and four times verbally.  Ms. Wilson believed that Fr. Shea's salacious remarks and treatment were undermining her efforts to perform her job.  However, no formal investigation was ever conducted, and Ms. Glass provided no substantive response to Ms. Wilson's complaints.

43.    In two instances, Ms. Wilson even went directly to Fr. John Sivalon, Superior General, regarding Fr. Shea's behavior, but no action was taken.

44.    Ms. Wilson also complained to Adriane Glass about Fr. Fries's inappropriate behavior.  Ms. Wilson was told by Ms. Glass that "this is Maryknoll.  This is just the way it is."  Ms. Wilson took this to mean that gay women are just not acceptable at Maryknoll.

45.    Ms. Wilson continued to complain about the harassment throughout her years at Maryknoll.  Maryknoll was well aware of her complaints of harassment and deliberately chose never to investigate or in any way address her complaints.

46.    On June 29, 2006, Ms. Wilson was illegally terminated in retaliation for raising her rights under anti-discrimination laws.  On that date, Fr. McAuley summoned Ms. Wilson to the Human Resource Department, terminated her, and told her that an investigation had

determined that she had somehow created a hostile work environment for other employees at Maryknoll.

47.   Ms. McGee never even suggested that Ms. Wilson had committed an inappropriate act.

48.   Upon information and belief, Ms. McGee knew that Ms. Wilson had not created a hostile work environment.   Furthermore, upon information and belief, Ms. Wilson's illegal termination was one, if not the only reason, for Ms. McGee's departure from Maryknoll.

49.   Upon information and belief, Fr. Sivalon, the Superior General, among others, seized an opportunity to associate Ms. Wilson with some unidentified wrongdoing, in an effort to terminate her.

50.   Upon Ms. Wilson's illegal termination, Maryknoll failed to notify Ms. Wilson of her right to elect to continue health coverage for eighteen (18) months after termination, as required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1166. (The law amends the Employee Retirement Income Security Act (ERISA), the Internal Revenue Code, and the Public Health Service Act to require most group health plans to provide a temporary continuation of group health coverage that otherwise might be terminated.)

## FIRST CAUSE OF ACTION

51.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" though "50" with the same force and affect as if separately alleged and reiterated herein.

52.   Defendant discriminated and retaliated against plaintiff in violation of Title VII of the Civil Rights Act.

8

53.    As a result, plaintiff suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

54.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" though "50" with the same force and affect as if separately alleged and reiterated herein.

55.    Defendant discriminated and retaliated against plaintiff in violation of New York Executive Law § 296, *et. seq.*

56.    As a result, plaintiff suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

57.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" though "50" with the same force and affect as if separately alleged and reiterated herein.

58.    Defendant discriminated and retaliated against plaintiff in violation of New York City Administrative Code § 8-502(a), *et. seq.*

59.    As a result, plaintiff suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

60.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" though "50" with the same force and affect as if separately alleged and reiterated herein.

61. Defendant discriminated against plaintiff by failing to notify plaintiff of her right to elect to continue health coverage for eighteen months after termination in violation of COBRA, 29 U.S.C. §§ 1166.

62. Plaintiff suffered prejudice by being unable to receive medical treatment due to defendant's failure to give the required notice and is thus entitled to statutory damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

(i)     On the First Cause of Action, actual damages to be determined at trial, but in no event less than $300,000;

(ii)    On the Second Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

(iii)   On the Third Cause of Action, actual damages in an amount to be determined at trial, but in no event less than $1,000,000 and punitive damages to be determined at trial, but no less that $1,000,000;

(iv)    On the Fourth Cause of Action, actual damages to be determined at trial, as well as attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1), which allows a court to award attorneys' fees "to either party" in an ERISA action.

(v)     Statutory attorney's fees pursuant to NYC Administrative Code § 8-502(a);

(vi)    Disbursements and other costs; and

(vii)    For such other and further relief which the Court deems just and proper.


## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:    New York, New York
          August 7, 2007


Walker G. Harman, Jr.
1350 Broadway, Suite 1510
New York, New York 10018
(212) 425-2600